Good morning, Your Honor. May it please the Court, I'm Tom Cohen, representing ERSAC and the three individual plaintiffs. If I may, I'd like to start with just illustrating what we're talking about, partly because it animates the printed text. That's the gadget. This is the Bear Vault. There's the top to it. This is the S-29 ERSAC, the one that was at issue in this case. And this, in fact, is one of the allegedly failed bags. This is the new model ERSAC, which the Park Service refuses to consider, along with anybody else's new material. I do this not only to illustrate the text, but also because I think this nicely shows two aspects of the equal protection argument. On one hand, in Sequoia, the Bear Vault failed a dozen times. The ERSAC has never failed there. And yet the ERSAC is banned. Another part of this is that the assumption by the government was that when the Bear Vault failed, it failed because there was a design defect in the closure. Actually, with this allegedly failed ERSAC, that's the same issue. There is no hole going all the way through to the middle of the bag. There's just a grommet that's ripped, and it was a user inability to cinch this tightly that made it fail. But in the case of Bear Vault, the government says, give us a fix, Mr. Manufacturer. And once you've given the fix, then we'll require people in Ray Lakes to use the new top, and everywhere else in the Sierra, you can use whatever you want. When ERSAC failed, they don't say, show us your design fix for that. They just ban it everywhere. And again, when the Bear Vault fails at Ray Lakes, the government says, okay, maybe you have to use a new design Bear Vault in the Ray Lakes area, but you can use whatever else you want. Use this anywhere else in the Sierra, regardless of whether it's fixed or not. ERSAC, when it fails, banned everywhere. But there's a second equal protection argument, and that is the entrenched hard-sided canister manufacturers versus the innovators. ERSAC is not the only company that makes alternatives to hard-sided canisters. The government now says, we will not consider any of those. The only thing, basically granting a monopoly to existing hard-sided canisters. That's not really for us. In this case, the issue of testing in the future and future products, I mean, that was brought up in your reply brief, I think, and it wasn't part of the record. So we can't really consider that part of it in this issue, in this case, can we? Well, I acknowledge that, Your Honor. The government opened the door on that by talking about what INYO had done since the record closed, which is INYO had a new rule which says you can use any bear canister that's designed to prevent bears from getting food. So they opened the door in terms of bringing into at issue things that have happened since 2007. Beyond that, I think there's a sense of judicial economy. We certainly don't want to be in court. The other folks don't want to be in court. And you can at least provide guidance, I think, to the manufacturers and the government as to how you look at this. But technically, you're correct. The new standard, although it is a published government standard, in effect, is not part of the record. You know, we submit that there's no plausible public policy reason for treating one company different than another when they're similarly situated. And I think the question is, well, are we here on a constitutional issue, or are we here under the to review an administrative decision? Well, you're certainly reviewing an administrative decision. Yeah. Within that, you are entitled to review the equal protection claim. As, for example, in the Merrifield case that we cited at length with the exterminators where one company was allowed to be on an extermination job and the other one was not. I think the ---- The standard is arbitrary and capricious, the review standard. Isn't that correct? Yes, Your Honor, with regard to the administrative review, although not the equal protection. Well, no, isn't it the equal protection? This is a ---- there's no suspect class here, so isn't it rational basis, which is essentially the same thing as arbitrary and capricious? I would agree. But it's still a different test to some degree. The law, if there's a rational reason to treat two different similarly situated companies differently, then that passes the test. I think the government pointed out in their brief that their decision is valid because it's a resource management decision. They cited a number of Interior Department Park Service regulations governing equipment. And one of the things they cited was the Coast Guard requirement for life vests, and I think that has a high degree of correlation here. The Coast Guard says you've got to wear a type 1, 2, 3, or 5 life vest. They don't say you must use a buoyancy vest or you must use one made by a particular manufacturer. They say on their website the perfect life preserver has not yet been designed. That's the same with a canister. None of these are perfect. Scalia. Are you sure you're addressing now what exact ---- what part of the decision are you focusing on? Well, really the arbitrary and capricious part that ---- Well, which part is arbitrary and capricious? The part that says a company where a canister has failed a dozen times gets to continue to be used by Camper, one that hasn't failed in Sequoia doesn't. Is that the same decision? The same. Is it a single decision that says this one's good and this one's not? What's the ---- I'm having a little trouble figuring out what we're reviewing here. Well, the review is from a decision in 2007, October 2007, where the now defunct Sierra Interagency Black Bear Group said ERSAC is banned. And the superintendents of each park adopted that. But hand-in-hand with that is if this is banned, well, what can you do? When was the other one approved? Well, this, like all the manufacturers, we have design changes. So it's been in business, I think, since 2004, 2005, and they have different iterations and they get approved on a rolling basis, in effect. But we're reviewing the proceeding that said that the order that said that this one was banned. Is that what ---- Is that correct? That's correct. But I don't think you can do that in a vacuum. The actual distinction between why the Bear Vault canister failed and why the ERSAC failed, I mean, aren't they entitled to deference? Isn't the government entitled to deference? They're entitled to deference if they have a full and complete record and their decision is based on that record. But they denied ERSAC the opportunity to make that complete record. For example, they never saw this bag. The government claimed in its brief that ERSAC, throughout the 2007 season, commented on a number of different bags. But, in fact, if you look closely at the record, we commented on two. And there was an e-mail a week before the meeting between ERSAC and a ranger in which ERSAC said, you know, do you have any statistics available regarding the success of ERSAC? And, you know, as far as ERSAC knew, it's performed almost flawlessly. The response was, we know of one incident, and then a day later we found another. So there were two incidents that the government was telling ERSAC about before the meeting. They don't invite evidence from ERSAC. They don't invite us to comment on it, refute it, show why this, in fact, is not a failed ERSAC. And so on that limited record, which are basically just police reports, single-page, bare incident reports, sometimes filled out by a ranger, sometimes filled out by a camper, they make a decision that this bag fails. We're never going to consider another one like it again. You know, the difficulty with your argument, I think, is this, is that we may agree with you as prospective hikers and laypeople, but we're sitting reviewing an agency decision, and our review is so deferential, it's very difficult to say that they don't have some reason for turning you down. And I know we might disagree with that if we were sitting in their shoes, but we're not sitting in their shoes. I mean, that seems to be the problem in this case, is that for each of those, they gave a reason, and you disagree with the reason. And we might say, well, there's some point to that disagreement. But in the end, why isn't the agency entitled to just make that decision if it considers all the facts and has a reason? Clearly, it's a high buck. But they're only entitled to a decision that is based on an incomplete record. It certainly has the risk of being arbitrary and capricious in this case. Well, I mean, let's take the bear vault. You point out quite properly that it failed a bunch of times. Their explanation is, well, it was one bear who figured it out. Now, you may say, well, it doesn't matter, and we might say it doesn't matter. But in our review of the agency, it's a reason. That is, it doesn't appear on its face to be arbitrary and capricious. We might disagree with it, but that's a whole different standard of review. So I'm only saying that because I'm just to frame your argument in terms of what is so egregious about this decision that puts it over into the arbitrary and capricious so it meets the arbitrary and capricious standard. Well, let's take the one bear theory. I like to call it the lone gunman theory. The lone claw theory. Exactly. You know, the record shows that clearly more than one bear has figured out how to get into bear vault. Their own record shows that. And so if you base a decision that says only one bear got into it, where the record shows more than one bear got in, that strikes me as not requiring deference in this court. Another example of that would be the compliance issue, where they claim that, although there's a lot of acknowledgment that the main cause of bear incidents in the Sierra is people just not using either one of these things or there's overflow food, but the only evidence that they have on the record is the Peter Rowlands of SACI saying that we show 91 percent voluntary compliance and it's not worth approving ERSAC to get some of that remaining 9 percent. Well, there's zero evidence in the record that, in fact, other than his statement, that there's 91 percent compliance. In fact, there's a single survey that's comprehensive by Kate McCurdy at Humboldt State, and in fact, her evidence is that there was, you know, only 62 percent of the campers were in compliance on every night of their trip. So do you have to give deference to a decision based on a false fact which has no evidentiary basis in the record other than the bear statement itself? You have about a minute left.  Thank you, Your Honor. Thank you. Good morning. My name is Tecla Hanson-Young, and I represent the Park Service and the Forest Service. To the extent that ERSAC attempts to demonstrate evidence, use demonstrative evidence before this Court to obtain a new sort of trial, this use is completely inappropriate in this APA record review case. Well, it's just good to see what it was. Aren't you glad to see what it is? I must admit I've looked up these products online. I've looked at videos of bears trying to get in. I'm curious also, and I understand that this Court is curious, and I think to that I didn't take it that way. We didn't admit it as evidence or anything else. Okay. Demonstrative evidence is demonstrative evidence. All right. Thank you. I'll illustrate what we're talking about. This case is about the Park and Forest Service's ability to manage bear and human interactions in Yosemite National Park, Sequoia and Kings Canyon National Park, and Inyo National Forest. Bears are getting human food from visitors in the parks and forests, and there are hundreds of bear and human incidents every year in these areas. This is not good for bears or for humans. Bears that become conditioned to human food can become aggressive towards humans and may eventually need to be euthanized. Can you explain to me why it's rational for the Forest Service to allow these bags and for the National Park Service to disallow them? The Forest Service and the Park Service face different bear-human management issues. The Forest Service, and let me first just say that the Forest Service orders that come out with respect to Inyo every year state that visitors must use canisters that are designed to be bear-resistant. Right. So to the extent that those canisters are not actually bear-resistant, and to the extent that they fail when used in the fields, that visitor may be cited for violating that forest order. Right. But that's not what the National Park Service requires. The National Park Service has different requirements. And living in a state where we have forests and national parks all around us, it doesn't seem to me very logical that one would distinguish between the two because bears go everywhere. So I'm asking you. As an agency, how do you defend one agency setting a different standard for similarly managed lands? These areas are different areas. And, in fact, what had been previously attempted to do was develop a uniform standard because visitors cross through these areas, and the point would be to make it easier for visitors to use these areas. But the Forest Service and the Park Service are different agencies and entitled to manage their different areas differently. In the forest areas, bears can be hunted and killed by hunters. In the Park Service, that's not the case. There may be more visitors annually in certain areas of Yosemite, and thus a higher level of bear and human interactions in certain park areas that the Forest Service doesn't have with respect to INYOS. There are different bear and human management issues facing both the Forest Service and the Park Service. And can you point to me in the record where it states that? The – I don't think that there's anywhere necessarily in the record that states the Forest Service faces different issues than – than in managing its forests than the Park Service faces. But the – I think it's clear from looking at the record that – Well, don't fault him for bringing things – bringing his exhibits here. When you're – if you don't have something in the record, you can point to it to explain the difference. Sure. But – but – I'd be – I want to be fair with you because I want you to explain it.  I didn't get any help from the record. I think that that's a fair question. But I think the fact that the Forest Service has changed its regulations does not mean – doesn't make the Park Service's decision arbitrary. The Park Service has – there's substantial evidence in the record indicating that the ERSAC S-29 model, which is the model at issue in this case, failed numerous times in parks and forests in 2007. It failed six times. And in six instances, wildlife – five bears and, in a sixth instance, mice and rodents were able to obtain food out of the containers. Four of the instances involved bears opening the tops of the bags and being able to get in and get the food that way. In one of the instances, a bag was completely ripped down the side by a bear. And then in the last instance, mice and chipmunks were able to get in and get the food. Right. With that – So then, of course, your opponent responds and says, well, the bear vault was failed 12 times. And apparently it was a clever bear. That's your response. Well, I – Maybe. The record shows – and there are citations in the brief discussing both the bear vault failures and the ERSAC failures in 2007. The bear vault failures in 2005 occurred in a small area in the forest. And the bear vault – that particular model was not allowed to be used in that area after those failures occurred. It was allowed to be used in other areas, but not that particular small area. It was reasonable for the Park Service and the Forest Service to determine that if the failures occurred in one area, it could be attributed to one bear. And in addition, the manufacturer redesigned the lid after that year and swapped out the older lids with the newer lids. After the Park Service notified ERSAC in 2007 that the conditional approval for the S-29 was removed, ERSAC did not attempt to work with the Park Service at that point to attempt to redesign its product. The next thing that happened was a lawsuit by ERSAC against the Park Service. Let me try to understand this. We're not talking about a nationwide decision. No. Some agency in Washington. We're talking about – I mean, we are, but we're not talking about something that applies nationwide. That's correct. Am I correct that the decision that the Park Service made was following the recommendation of the Sierra Intermediate Area, whatever it was, that was Black Bear, that was specifically studying the Black Bear problem in a specific area? That's correct. These decisions were made solely with respect to certain sensitive areas in Yosemite, Sequoia and Kings Canyon, and Inyo, and were not made at a national level. That's correct. Okay. And prior to that recommendation, there had been provisional approval for the use of this, and then the Park Service withdrew the approval after the recommendation. Is that essentially what happened? ERSAC had submitted many models previously since 2001 to the Sierra Bear Group for testing, and there's a long history that's detailed in the briefs. This particular model had – the fabric that was used in this model had been used and extensively tested in 2004, but with a thinner aluminum insert. It was resubmitted as a product for 2007 for use in the summer 2007 season. And at that point, because of the long history of failures with this product and similar products by ERSAC, the Park and Forest Service initially didn't want to use it in the parks and the forests that summer, or in Yosemite and Sequoia and Inyo that summer. And after reconsidering the issue, meeting with ERSAC a lot, several times, with having phone calls with ERSAC in early 2007, the Park and Forest Service decided to allow visitors to use the ERSAC S-29 in 2007 in restricted areas that require canisters. Throughout that summer, ERSAC and the Park and Forest Service were in constant communication about the failures that – the reported failures that had occurred in the summer. And towards the end of that season, the Park and Forest Service compiled a list through the Sierra Bear Group, compiled a list of the failures, looked at 19 reported incidents, looked at the evidence surrounding those incidents, and concluded that in six of those incidents, wildlife had managed to obtain food from the ERSAC. The other basis for the Park Service's decision is the fact that the ERSAC failed at a disproportionately higher rate than other hard-sided bear canisters. So going back to this 12 bear vault failures, there are hundreds of visitors, even thousands of visitors using bear vaults and Garcias with almost no reported incidents. And indeed, in 2006 and 2007, the record shows that there is only one single reported incident that may or may not have occurred, may or may not have been a failure in 2006 and 2007 for the bear vault, whereas the number of visitors using ERSACs was less than 500 in the parks in 2007, and the failures were, therefore, disproportionately higher. So that alone provides an independent basis for this Court to formally introduce. Sotomayor, what was the recommendation of the Sierra Bear Group based on? The recommendation for 2007 was to disallow visitors from using the – On the basis of the experience in 2007? Yes, that's correct, on the basis of the six failures. And then the Park Service – the Forest Service didn't make the same recommendation? That's – that's – Didn't make the same decision? That's correct. And, in fact, the – the – part of the reason why there may be nothing in the record concerning the Forest Service's decision is that this lawsuit was filed before the Forest Service made its decision for the next – for the 2008. The only thing I see in the record is that there's a memorandum of understanding between all the agencies. They say we want uniform – we want uniform rules. That is correct. And although this is extra record evidence, the Forest Service and Park Service are in the process of determining how to move forward and whether or not it's appropriate to develop national testing standards or national – you know, nationally approved – determine a way to, you know, develop nationally approved containers that can be used. But that's – that issue is not before this Court, and that's something that the Forest Service and Park Service are struggling to address in determining the best way of managing bear and human interactions. But both – I mean, that's – the only thing I see in the record is that the – there's supposed to be a uniform standard, and I realize things can change, but – Yes. I mean, that's correct. The Park and Forest Service decided in 2001 that it would be best if they could work together to develop uniform – But that's aspirational? Right. That's aspirational. I mean – and even so, both – in that – in the record, the testing standards that were developed over time were written in a way that was flexible because administrators recognized that different situations arise within different management areas and different – and different facts could lead – could lead to a need for different decisions to be made. There was a recognition that there needed to be flexibility to address individualized issues. And the record even shows that different park managers still – and that the park and forest managers still believed that they were separate entities. For example, in early 2007, when the Park and Forest Service officials were discussing whether to conditionally approve the ERSAC S-29, the managers for Sequoia and Kings Canyon offered to allow the ERSAC S-29 to be used only in their park and use that as the – as sort of the testing for the product. So there's – the agencies never, you know, stated definitively that there had to be uniform standards across all areas. I mean, I think that's the question raised. If an arbitrary and capricious challenge, if a different agency is taken to a different point of view, that's something that our case law says we can take into consideration. Yeah. That may be true, but ERSAC has not raised that argument in this case. No, I'm just asking a question. And I think that – I think that looking at the – you know, another basis or indicator in the record that could show that these areas are managed differently is simply by looking at the statutes that govern the – and the statutes and regulations that govern the uses of parks and forests. Forests are managed with respect to a multitude of resources and a multitude of different uses, whereas parks are – Because I live in bear country, you don't say, well, we want bears to get food in the forest service lands, and we – you know, we don't want them to get food in the park service. No. You don't want to habituate any bear, and you want to protect campers. That's correct. So you'd say it's different because you've got a park boundary, and then five feet over here is forest service, which is what the situation is by the neck of the woods. It doesn't make any sense to have a different – particularly different rule saying we need for management. And I don't think that the – the rules aren't particularly different. The forest service does not allow ineffective bear-resistant canisters to be used. So if a visitor comes in and uses a – uses an ERSAC that fails, that visitor will be cited and – for violating the order. But on one side, if you use an ERSAC that succeeds, you're not liable. On the park side, if you use an ERSAC, period, you're in violation. That's the difference. That's correct. So even if this Court takes that into account, which I don't think that just because the forest service does one thing and the park service does another means that what the park service did is arbitrary. But even if the Court considers that, there's still ample evidence in the record to support the park service's decision to disallow the use of the ERSAC S-29. And simply because the park service chooses to impose a standard that is more protective of bears and humans than the forest service doesn't mean that that decision is arbitrary when there's enough basis in the record to support the finding that the ERSAC S-29 was ineffective and was not protecting bears and humans, which is a legitimate goal of the park and the forest service in this case. Unless there are any other questions, I would ask that this Court affirm the judgment of the district court. Thank you. Thank you. The reference to demonstrative evidence is notable simply for the fact that this is the first decision-making body in which ERSAC has been actually allowed to show physical evidence. I think, Your Honor, Judge Thomas drives home an important you're not trying to make a point. He asks an important question, also illustrated by the facts. Why this particular S-29 was allegedly failed at Thousand Island Lake. That's just over the border from Yosemite. It's 20 miles from Half Dome, which is where most of the ERSAC failures took place. And yet, in 2008, 9, and 10, one could use an ERSAC at Thousand Island Lake and you could not at Yosemite. So the question is, is this a nation-wide rule? It is not. But Yosemite is the greater among equals. So many, many national parks look, and REI, for example, looks to what Yosemite does as if it knows what it's talking about. I mean, in effect, I think that's a. I understand. As a denizen of Yellowstone, I beg to differ. Well, I come from the Grand Canyon State, but, okay. Thank you, counsel. Thank you, Your Honor. Time has expired. The case just argued is submitted for decision. And that concludes the Court's argument for this morning.
judges: Adelman, Schroeder, Thomas